IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| NIKKI J. HERNANDEZ,<br><br>                    Plaintiff,<br><br>        vs.<br><br>NANCY A. BERRYHILL,<br>Acting Commissioner of Social Security<br><br>                    Defendant. | **8:18CV274**<br><br>**MEMORANDUM AND ORDER** |

This is an action for judicial review of a final decision of the Commissioner of the Social Security Administration ("the Commissioner"). Filing No. 1. The claimant, Nikki J. Hernandez, appeals the Commissioner's decision to deny her application for Social Security Disability ("Disability") and Supplemental Security Income ("SSI") benefits under Titles II and XVI of the Social Security Act and seeks review pursuant 42 U.S.C. § 405(g), see Filing No. 14 (Plaintiff's Motion for an Order Reversing the Commissioner's Decision) and Filing No. 17 (Defendant's Motion for an Order Affirming the Commissioner's Decision). A transcript of the hearing held on May 26, 2017, is found in the record at Filing No. 10-3. This Court has jurisdiction under 5 U.S.C. §§ 702 and 706 to review the final decision.

## BACKGROUND

### I. Procedural History

Hernandez filed an application for disability and SSI on January 22, 2015. She alleges disability due to depression, anxiety, multi-joint osteoarthritis, degenerative joint disease in the knees, and obesity. Filing No. 1. Her Form SSA-3368 Disability Report

alleges disability based on depression, arthritis, fluid in her legs, and memory loss. Filing No. 10-7, 236. The Commissioner denied her claims on July 9, 2015 and again upon reconsideration on August 11, 2015. After a hearing on May 26, 2017, with an Administrative Law Judge ("ALJ"), Hernandez was further denied benefits and held not disabled on September 6, 2017. The Appeals Counsel denied review on April 17, 2018. Hernandez seeks review of the ALJ's order denying benefits.

## II.    Testimony from ALJ Hearing

Ms. Hernandez was born on April 30, 1980. She has an eighth-grade education and has had numerous jobs of short duration. Filing No. 10-3, at 82. The ALJ concluded that Hernandez had not engaged in substantial gainful activity ("SGA") since January 22, 2015. Filing No. 10-2, at 17. At the hearing on May 26, 2017, Hernandez testified that she had tried to get a GED but failed due to her inability to do simple math. Filing No. 10-3, at 85-86. She agreed that she tried several jobs but testified that none of them lasted long due to her physical and psychological problems. *Id.* at 86. Hernandez affirmed that she had never made more than $1,000 a month at any job. *Id.* at 87. She testified that the physical tasks of her prior jobs were too hard and caused her body and legs to hurt. *Id.* at 87-88. Specifically, she testified that she could not stand long and would have to go home due to the pain. *Id.* at 88.

 In addition to leg pain, Hernandez testified that she has pain in her knees, with her right knee being worse than her left. *Id.* at 90. She stated that the pain makes it hard for her to go up and down stairs, and she cannot stand in the shower, and she has difficulty standing up after sitting in the shower. *Id.* at 91. Hernandez testified that knee replacement surgery had been discussed with her. *Id.* However, she stated she is not

qualified for the surgery because she is too young. *Id.* Hernandez further testified that her feet and ankles swell and must be soaked, iced and heated, and elevated. *Id.* at 91–92. She testified that the pain and swelling throughout her body is attributed to osteoarthritis and deteriorating joint disease. *Id.* at 90–91. According to Hernandez, the physical pain she experiences in her legs, knees, ankles, and feet require her to spend "a lot" of the day (somewhere between "[h]alf of it" and a "[m]ajority" of it), sitting with her feet elevated. *Id.* at 92. Hernandez stated that due to her legs "lock[ing] up" she needs to move frequently. *Id.*

Hernandez testified that the osteoarthritis and deteriorating joint disease has spread to her elbows. *Id.* at 92-93. She affirmed that her elbow problems would affect her ability to reach and pull. *Id.* at 93. Hernandez testified that she has sciatica and lower back pain which runs down her legs. *Id.* at 93. She stated that the pain contributed to her problems with walking and standing. *Id.* at 93-94.

Overall, Hernandez testified that she could walk about 5-10 minutes, stand for 15 minutes and comfortably sit for 20-30 minutes before her legs would lock up. *Id.* at 94. She testified that the pain occurs "all the time" and on really bad days, she cannot accomplish anything or go to work or any doctor's appointments. *Id.* at 95-96. During the hearing Hernandez asked whether she would be able to stretch. *Id.* at 104.

With regards to her psychological limitations, Hernandez testified that being around people makes her anxious. *Id.* at 98. Hernandez stated that there were times when she would go to the store and have to leave the store due to her anxiety. *Id.* This anxiety occurred while she was working also. *Id.* at 86. She testified that she would get

frustrated and would have to go outside or go to the bathroom because it would be hard for her to breathe. *Id.* at 86-87.

When asked about her work speed and productivity compared to other workers, Hernandez responded that "[I]t was a problem." *Id.* at 87. When asked about whether she could follow written instructions, Hernandez stated that she would need someone to be hands-on with her. *Id.* at 87. When she was given instructions, she testified that she would sometimes have difficulty following the instructions because she would lose concentration. *Id.* Hernandez stated that she could only "sometimes" watch a 30-minute television show and she cannot concentrate on reading. *Id.* at 99-100.

In addition to anxiety and problems focusing, Hernandez stated that she suffers from depression and has crying spells a couple times a week. *Id.* at 98-99. She stated that the crying spells can be short or last all day. *Id.* at 99. She further stated that on days when she has an all-day crying spell, she has no energy at all. *Id.* at 99. In sum, Hernandez testified that about three times a week she does not interact with anyone and lays down and cries. *Id.* at 101.

Hernandez testified that she was not seeing a psychologist or psychiatrist, but her primary nurse practitioner, Julie Nieveen, treats her for her mental health. *Id.* at 96-97. Hernandez stated that she was prescribed Ativan and Sertraline for her depression and anxiety. *Id.* According to Hernandez, Nieveen recommended she be treated by a mental health professional. *Id.* at 97.

Hernandez testified that in 2016 she worked at McDonald's for 3-4 months. *Id.* at 87. She testified that she began working full-time and then was reduced to part-time due to her leg pain. *Id.* at 87-88. She testified that she was fired because she missed work,

and she was unable to work the hours that were needed. *Id.* at 89. Hernandez testified that job attendance was a regular problem at other jobs and she was fired from other jobs. *Id.* She stated that she was fired from Subway because she failed to come in to a shift due to leg pain. *Id.* at 90.

When asked whether she could work if she did not have any mental anxiety issues, and only physical problems, Hernandez responded "No." *Id.* at 101-02. Similarly, when asked whether she could work if she did not have any physical problems, but only mental problems, Hernandez responded that she would not be able to work. *Id.* at 102.

### III. Medical Evidence

Hernandez's Nebraska Medical Center health records reflect, among other things, diagnoses of recurrent depression, anxiety, arthritis, hypertension, bilateral chronic knee pain, bilateral elbow joint pain, chronic left shoulder pain, degenerative joint disease. *See* Filing No. 10-8, at 359-60; Filing No. 10-9, at 411-12, 419, 447, 462-64, 471-72. Throughout 2014, she presented to Nebraska Medical Center at least four times with symptoms of low back pain, obesity, abdominal pain, flank pain and chronic bilateral knee pain. Filing 10-8, at 321-48.

In April of 2015, while attending a follow-up appointment with her general nurse practitioner, Julie Nieveen, for her chronic knee pain, depression and anxiety, Hernandez reported "sadness, tearfulness, difficulty falling asleep, self[-]isolation." *Id.* at 358. It was noted that her mood began to worsen after her boyfriend was murdered in 2013. *Id.* A Patient Health Questionnaire-9 ("PHQ-9") screening classified Hernandez as having moderate depression with a score of 14[1]. *Id.* In July of 2015 an x-ray of her knee showed

---

[1] The Patient Health Questionnaire-9 ("PHQ-9") is a multipurpose questionnaire to screen, diagnose, monitor and measure the severity of depression. The score ranges include:

severe degenerative joint disease. Filing No. 10-9, at 426-28. At the appointment she was referred to orthopedics and counseled that she probably would need a knee replacement. *Id.*

In January of 2016, at a follow up appointment for her chronic bilateral knee pain, she reported sadness. *Id.* at 460. A second PHQ-9 screening classified Hernandez as having mild depression with a score of 5. *Id.* at 460-61. In May of 2016, Hernandez presented to the Nebraska Medical Center with left elbow pain. *Id.* at 433-36. The medical report diagnosed her with mild left elbow degenerative joint disease. *Id.* at 434-35. In October of 2016, Hernandez was diagnosed by Nieveen with hypertension, osteoarthritis of both knees, chronic bilateral elbow pain, and chronic left shoulder pain. *Id.* at 470-72. Her diagnoses of anxiety, depression, hypertension, and chronic bilateral knee pain due to degenerative joint disease were again discussed in January of 2017. *Id.* at 455.

## IV. Medical Opinions

On April 19, 2017 Hernandez presented for a psychological consultative examination with Dr. Beverly A. Doyle after being referred there by her attorney. Filing No. 10-10, at 475-78. Dr. Doyle diagnosed Hernandez with Major Depression (chronic, moderate), posttraumatic stress disorder ("PTSD"), and gave her a GAF score of 45. *Id.* With regards to Hernandez's ability to work, Dr. Doyle determined that Hernandez exhibited "Marked Limits (Poor Functioning)" with regards to her ability to "Perform at a consistent pace without unreasonable number and length of rest periods" and "Work in

---

1-4 Minimal Depression
5-9 Mild Depression
10-14 Moderate Depression
15-19 Moderately Severe Depression
20-27 Severe Depression.

coordination and proximity to others." *Id.* at 482-85. Functionally, Dr. Doyle noted that Hernandez would have extreme difficulties in maintaining social function, and maintaining concentration, persistence or pace. *Id.* at 483. Dr. Doyle noted that Hernandez would be off task or unable to work at a competitive pace for more than 20% of an 8-hour work day. *Id.* at 484. Finally, Dr. Doyle stated that Hernandez's impairments or treatments would cause her to be absent from work more than 4 days per month. *Id.* Dr. Doyle reported Hernandez as having a GAF[2] score of 45. *Id.* at 476-77.

On June 30, 2015 Hernandez presented for a psychological consultative examination with Dr. A. James Fix.[3] Filing No. 9, at 415-20. Dr. Fix noted that Hernandez has restrictions on activities of daily living, and difficulties in maintaining social functioning. *Id.* at 415. Dr. Fix also stated that Hernandez is unable to sustain concentration and attention needed for task completion, noting that this ability was "mildly impaired" on the date of examination. *Id.* Dr. Fix stated that Hernandez was only "marginally" able to relate appropriately to co-workers and supervisors. *Id.* During the examination, Hernandez was able to add 2+2+2 and multiply 3x3, but unable to multiply 3x3x3. *Id.* at 419. According to Dr. Fix, Hernandez "gave up easily on serial 7's and did not accomplish any of those, although [Dr. Fix's] impression was she probably could have done some of them." *Id.* Dr. Fix stated that Hernandez seemed to function on the "low average area of

---

[2] The Global Assessment of Functioning ("GAF") score is the clinician's judgment of the individual's overall level of functioning. *See* Diagnostic and Statistical Manual of Mental Disorders, DSM–IV-TR, 32 (4th ed. 2000). A GAF score of 41-50 indicates serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). *Id.* at 34. A new edition of the Diagnostic and Statistical Manual of Mental Disorders (DSM-V) was released in 2013 and replaced the DSM-IV. The DSM-V "no longer uses GAF scores to rate an individual's level of functioning because of 'its conceptual lack of clarity' and 'questionable psychometrics in routine practice.'" *Alcott v. Colvin, No. 4:13-CV-01074-NKL, 2014 WL 4660364, at *6 (W.D. Mo. Sept. 17, 2014).*
[3] Hernandez was referred to Dr. Fix through the Disability Determination Services of the State of Nebraska, Department of Education Division of Rehabilitation Services.

intellectual ability" but "some of her capacity is lost by emotional interference." *Id.* Dr. Fix reported Hernandez as having a GAF score of 45, with a high of 60. *Id.*

The combined reports of the clinical psychologists suggest that Hernandez's depression and PTSD is linked to several different stressors. *See* Filing No. 10-8, at 358; Filing No. 10-9, at 417; Filing No. 10-10, at 475. First, there are significant instances of physical violence in her past. Psychologist A. James Fix reported that Hernandez had been raped at gunpoint at age 14. Filing No. 10-9, at 417. Psychologist Beverly A. Doyle reported that Hernandez had been raped twice. Filing No. 10-10, at 475. She has also been abused by at least one domestic partner. Filing No. 10-10, at 417 (noting abuse by one domestic partner); Filing No. 10-10, at 475 (noting abuse by two domestic partners). Second, in approximately 2013 she suffered the loss of her fiancé/boyfriend when he was murdered. Filing No. 10-8, at 358; Filing No. 10-9, at 417. Third, she reports stress due to losing her children to the State. Filing No. 10-9, at 417.

On June 30, 2015 Hernandez also presented for a medical examination with Dr. Samuel E. Moessner.[4] Filing No. 10-9, at 400-13. Dr. Moessner's impressions included obesity, degenerative joint disease, anxiety, depression, a history of polysubstance abuse and plantar fasciitis with bilateral heel spurs, a history and possible findings of a right lateral retinal detachment, and status post appendectomy, status post salpingectomy, and status post dilation and curettage of the uterus on several occasions. Filing No. 10-9 at 411. Dr. Moessner stated that Hernandez was living with her sister at the time, and between the two of them, they could manage to provide safekeeping for any disability benefits that would be granted to Hernandez. *Id.* at 412.

---

[4] Hernandez was referred to Dr. Moessner through the Disability Determination Services of the State of Nebraska, Department of Education Division of Rehabilitation Services.

### A. Consultative Examinations

Two Social Security consultants, Patricia Newman, Ph. D., and Lee Branham, Ph.D., also offered opinions. Dr. Branham and Dr. Newman found that Hernandez would only marginally be able to relate appropriately to other people. Filing No. 10-4, at 121, 136. They noted that there were significant symptoms of depression and PTSD. *Id.* at 120, 136.

Additionally, Dr. Newman and Dr. Branham found that Hernandez appeared to function in the low average area of intellectual ability and would have limitations in regard to her ability to adapt. *Id.* at 121, 137. Both further noted that Hernandez would have limitations with regard to sustaining concentration and persistence. *Id.* at 121, 136. Finally, Dr. Newman and Dr. Branham found that Hernandez was capable of sedentary work, and she did not satisfy the criteria of "paragraph B" or "paragraph C" for mental disability. *Id.* at 116, 122, 130-32.

### V. The ALJ's Findings

The ALJ found that Hernandez is not under a disability as defined in the Social Security Act. Filing No. 10-2, at 15. The ALJ undertook the familiar five step sequential process for analyzing and determining disability. *Id.* at 15-26. The ALJ found that Hernandez has not engaged in substantial gainful activity since January 22, 2015, the application date. *Id.* at 17. The ALJ agreed with the finding that Hernandez suffers from depression, anxiety, history of polysubstance abuse (in recent remission), multi-joint

osteoarthritis, degenerative joint disease in the knees and obesity, and that all of these impairments are severe. *Id.*

The ALJ concluded that Hernandez's physical impairments do not meet or medically equal the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926). *Id.* at 18. The ALJ found that Hernandez was able to ambulate effectively under section 1.00B2b, did not have a compromised nerve root or spinal cord under section 1.04, and failed to meet the requirements for arthritis under 14.09. *Id.* at 18. With regards to her mental impairments, the ALJ found that they did not individually nor in combination meet or medically equal the criteria listings of 12.04 (affective disorders) and 12.06 (anxiety-related disorders). *Id.* at 19. The ALJ concluded that Hernandez did not satisfy "paragraph B" criteria and found that Hernandez only has moderate limitations. *Id.* at 19-20. The ALJ noted that Hernandez was cooperative and oriented in all spheres during her examinations and that she has normal mood and affect. *Id.* at 19. The ALJ cited one Nebraska Medical Center record which found her negative for dysphoric mood, not nervous and not anxious. Filing No. 10-8, at 325. The ALJ found that Hernandez had moderate limitations in understanding, remembering or applying information, and moderate limitations with interacting with others. Filing No. 10-2, at 19. Citing to Hernandez's statement that she could sometimes concentrate enough to watch a 30-minute television show, the ALJ found that she only had moderate limitations with regards to concentrating, persisting or maintaining pace. *Id.*

The ALJ determined that Hernandez had residual functioning capacity ("RFC") to perform sedentary work as defined in 20 CFR 416.967(a) except she could occasionally

push and pull 10 pounds.  *Id.* at 20.  Additional limitations include: no more than occasional balancing, kneeling, stooping, crouching, crawling, and climbing ramps and stairs; never climbing ladders, ropes, or scaffolds; never being exposed to vibrations or workplace hazards like moving mechanical parts or unprotected heights; no more than accessional pushing, pulling, and operating foot controls with lower extremities; no more than simple, unskilled instructions and tasks; no more than occasional interactions with coworkers, supervisors, and the public; no more than occasional changes in the workplace environment; and no fast-paced, assembly-line, or high production quota work. *Id.*

The ALJ granted great weight to the opinions of Dr. Newman and Dr. Branham, who found that Hernandez had no significant limitations with regards to her ability to follow simple questions, request assistance, and get along with coworkers or peers.  *Id.* at 22-23.  On the other hand, the ALJ granted little weight to Dr. Doyle because her assessment was "not based on any objective medical evidence."  *Id.* at 23.  The ALJ found that Dr. Doyle's findings that Hernandez had a GAF score of 45 was inconsistent with the evidence that Hernandez was able to live independently.  *Id.*  Additionally, the ALJ granted partial weight to Dr. Fix's assessment.  *Id.*  This was largely due to Dr. Fix stating Hernandez had a GAF score of 45, but that it could be as high as 60.  *Id.*

After weighing this information, the ALJ found that Hernandez's statements concerning the intensity, persistence, and limiting effects of her medical symptoms are not entirely consistent with the medical evidence and the evidence on the record.  *Id.* at 24.  As such, the ALJ found that Hernandez was not precluded from work within the described RFC.  *Id.*

The ALJ found that Hernandez was capable of working as a document preparer, an addresser, or a cutter/paster. *Id.* at 25. This determination was based on the hypothetical questions presented to the vocational expert and considered Hernandez's age, education, work experience, and RFC. *Id.* As such, the ALJ determined that Hernandez had not been under a disability since January 22, 2015, the date her disability application was filed. *Id.* at 26.

## STANDARD OF REVIEW

This Court's review is limited to an inquiry into whether there is substantial evidence on the record to support the findings of the ALJ and whether the ALJ applied the correct legal standards. *Perkins v. Astrue*, 648 F.3d 892, 897 (8th Cir. 2011); *Lowe v. Apfel*, 226 F.3d 969, 971 (8th Cir. 2000). Substantial evidence means something less than a preponderance of the evidence, but more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Moore v. Astrue*, 572 F.3d 520, 522 (8th Cir. 2009) (quoting *Lewis v. Barnhart*, 353 F.3d 642, 645 (8th Cir. 2003)); *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. of New York v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). However, this "review is more than a search of the record for evidence supporting the [Commissioner's] findings," and "requires a scrutinizing analysis." *Scott ex rel. Scott v. Astrue*, 529 F.3d 818, 821 (8th Cir. 2008).

## DISCUSSION

### I.  Appointments Clause

Hernandez argues that the ALJ was an inferior officer who was not appointed in a constitutional manner. Filing No. 14-1, at 18. Under the theory that the ALJ was not

correctly appointed, Hernandez states that the ALJ's decision must be vacated and her claim must be remanded and heard by a new ALJ.  *Id.*  The Commissioner argues that Hernandez's appointments clause claim is untimely because it was not raised during her initial application for benefits, on reconsideration, in her hearing with the ALJ or before the Appeals Council.  Filing No. 18, at 12.  In response, Hernandez argues that her claim is timely, and even if it were not timely, the Court should exercise its authority of discretionary review and find the ALJ was improperly appointed.  Filing No. 14-1, at 19-24.

The Court finds that Hernandez's argument that the ALJ was an inferior officer not appointed in a constitutional manner is untimely.  While Hernandez argues that the claim was not forfeited or waived even though it was not presented to the ALJ or the Appeals Counsel, this argument is unpersuasive.

As the Commissioner argues, a constitutional challenge under the Appointments Clause is "nonjurisdictional" and therefore forfeited when it was not raised during the administrative process.  As stated by the Commissioner, multiple district courts have held that a challenge to the appointment of an ALJ must be raised in the administrative proceedings to preserve it for judicial review.  *Stearns v. Berryhill*, No. C17-2031-LTS, 2018 WL 4380984, at *6 (N.D. Iowa Sept. 14, 2018) (holding an Appointments Clause claim was forfeited because it was not raised before or during the ALJ's hearing, or any time before the ALJ's decision became final); *Page v. Comm'r of Soc. Sec.*, No. 17-13716, 2018 WL 5668850, at *3 (E.D. Mich. Oct. 31, 2018)  (denying a motion for leave to amend a complaint to challenge the appointment of a ALJ because it was not timely challenged); *Williams v. Berryhill*, No. 2:17-cv-87-KS-MTP, 2018 WL 4677785, at *2 (S.D. Miss. Sept.

28, 2018) (holding that an Appointments Clause claim was waived because it was not raised before the agency); *Hugues v. Berryhill*, No. CV17-3892-JPR, 2018 WL 3239835, at n.2 (C.D. Cal. July 2, 2018) (holding that the Appointments Clause claim was waived because it was not raised during the administrative proceedings); *Garrison v. Berryhill*, No 1:17-cv-00302-FDW, 2018 WL 4924554, at *2 (W.D.N.C. Oct. 10, 2018) (holding that the Appointments Claim was forfeited because it was not raised during the administrative proceeding); *Davidson v. Comm'r of Soc. Sec.,* No. 2:16CV00102, 2018 WL 4680327, at *2 (M.D. Tenn. Sept. 28, 2018) (same); *see also Blackburn v. Berryhill*, No. 0:17-120-DCR, 2018 WL 5085759 (E.D. KY. Oct. 18, 2018) (noting an appointments clause claim was denied).

The Court finds the Commissioner's argument persuasive. The general rule is that an Appointment Clause challenge must be raised during the administrative proceeding. *See e.g. generally Stearns*, No. C17-2031-LTS, 2018 WL 4380984, at *6. As a "nonjurisdictional" issue, an Appointment Clause challenge is within the court's discretion to consider. *Fretay v. C.I.R.*, 501 U.S. 868, 879 (1991). However, it is a "rare case" when a court decides to consider an untimely Appointment Clause challenge. *Id.* at 879. The Supreme Court made it clear that in using its discretion to hear an untimely Appointment Clause challenge, *Fretay* was an exception to the common rule that all issues and objections by a litigant must be raised at trial. *Id.* This rule is reinforced by *Lucia v. S.E.C.*, 138 S.Ct. 2044, 2055 (2018), in which the Court states that only "one who makes a timely challenge" is entitled to relief (quoting *Ryder v. United States*, 515 U.S. 177, 182-183). Hernandez has failed to demonstrate why her case should be the exception to the common rule.

## II.    Disability Decision

### A.  Sequential Analysis

To determine whether a claimant is entitled to disability benefits, the ALJ performs a five-step sequential analysis.  20 C.F.R. § 404.1520(a)(4).  At step one, the claimant has the burden to establish that she has not engaged in substantial gainful activity since her alleged disability onset date.  *Cuthrell v. Astrue*, 702 F.3d 1114, 1116 (8th Cir. 2013). At step two, the claimant has the burden to prove she has a medically determinable physical or mental impairment or combination of impairments that significantly limits her physical or mental ability to perform basic work activities.  *Id.*  At step three, if the claimant shows that her impairment meets or equals a presumptively disabling impairment listed in the regulations, she is automatically found disabled and is entitled to benefits.  *Id.*  If not, the ALJ determines the claimant's RFC, which the ALJ uses at steps four and five. 20 C.F.R. § 404.1520(a)(4).

A claimant's RFC is what she can do despite the limitations caused by any mental or physical impairments.  *Toland v. Colvin*, 761 F.3d 931, 935 (8th Cir. 2014); 20 C.F.R. § 404.1545.  "The ALJ must determine a claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians and others, and the claimant's own descriptions of [her] limitations."  *Papesh v. Colvin*, 786 F.3d 1126, 1131 (8th Cir. 2015).  The RFC must give appropriate consideration to all of a claimant's impairments and be based on competent medical evidence establishing the physical and mental activity that the claimant can perform in a work setting.  *Mabry v. Colvin*, 815 F.3d 386, 390 (8th Cir. 2016).

At step four, the claimant has the burden to prove she lacks the RFC to perform her past relevant work. *Cuthrell*, 702 F.3d at 1116. If the claimant can still do her past relevant work, she will be found not disabled; otherwise, at step five, the burden shifts to the Commissioner to prove, considering the claimant's RFC, age, education, and work experience, that there are other jobs in the national economy the claimant can perform. *Id.*; *see Jones v. Astrue*, 619 F.3d 963, 971 (8th Cir. 2010).

### B. Treating Sources

The ALJ must give "controlling weight" to a treating physician's opinion if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." *Papesh*, 786 F.3d at 1132. Even if not entitled to controlling weight, a treating physician's opinion should not ordinarily be disregarded and is entitled to substantial weight. *Id.* The regulatory framework requires the ALJ to evaluate a treating sources' opinion in consideration of factors such as length of treatment, frequency of examination, nature and extent of the treatment relationship, support of opinion afforded by medical evidence, consistency of opinion with the record as a whole, and specialization of the treating source. *Id.; see* 20 C.F.R. 404.1527(c)(2). "When an ALJ discounts a treating [source's] opinion, he should give good reasons for doing so." *Davidson v. Astrue*, 501 F.3d 987, 990 (8th Cir. 2007); *Jenkins v. Apfel*, 196 F.3d 922, 924–25 (8th Cir. 1999) (stating the ALJ may discount or disregard such an opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions).

The ALJ erred by granting little, or partial weight to Dr. Doyle and Dr. Fix. Filing No. 10-2, at 23. The ALJ granted little weight to the opinion of Dr. Doyle, stating that her

assessment was not based on any objective medical evidence but rather Hernandez's "subjective rendition of limitations." *Id.* Despite the alleged subjectivity of Dr. Doyle's analysis, her diagnoses match that of almost every other health provider's general assessment of Hernandez. Dr. Doyle classified Hernandez as having major depression and PTSD. From these diagnoses and her questioning of Hernandez, Dr. Doyle determined Hernandez's limitations. The foundation for Dr. Doyle's determined limitations is repeated throughout Hernandez's medical record. Like Dr. Doyle, Dr. Fix diagnosed Hernandez with PTSD and depression. Both State consultants noted that Hernandez possessed significant symptoms of depression and PTSD. Turning to her regular nurse practitioner, Ms. Nieveen conducted several depression screenings with Hernandez, and diagnosed her with both recurrent depression and anxiety. Ms. Nieveen even prescribed sertraline (Zoloft), an antidepressant, to Hernandez. Moreover, the GAF score of 45 provided by Dr. Doyle was similarly provided by Dr. Fix. The evidence presented by Hernandez's medical records and the other consultants demonstrate that Dr. Doyle's assessment was grounded in objective medical evidence.

Additionally, the ALJ granted only partial weigh to Dr. Fix, stating that Dr. Fix's clinical observations did not support his restrictive statements. The fact that some observations may not appear as significant as other observations cannot change the fact Dr. Fix classified Hernandez as having major depression and PTSD. Moreover, Dr. Fix's clinical observations are not directly opposed to these diagnoses. Among other things, Dr. Fix reported Hernandez as having loss of energy, loss of interest, and showing vegetative signs.

Through discounting the evidence relating to her psychological problems, the ALJ found that Hernandez's "behavior, judgement, and affect remain generally normal." *Id.* at 22. This contradicts the opinions provided by Dr. Doyle and Dr. Fix, and the medical reports from Nieveen. Instead, the ALJ relied on Social Security consultants, Dr. Newman and Dr. Branham, who opined that Hernandez was capable of work. Additionally, the ALJ cited one Nebraska Medical Center record which stated that Hernandez presented as negative for dysphoric mood, nervousness, and anxiety. Filing No. 10-8, at 324. However, the Nebraska Medical Center record in this instance primarily dealt with an abscess on Hernandez's arm and vaginal bleeding, not psychological concerns. Hernandez's other records sufficiently demonstrate a history of significant mental illness.

The Court finds that Hernandez's symptoms, both objective and subjective, are supported by the evidence presented. In this case, the ALJ did not properly assess the weight of the consulting clinical psychologists' opinions. As such, the Court finds that Hernandez is clearly disabled.

### C. Vocational Expert Testimony

To satisfy the Commissioner's burden of showing the claimant is capable of performing other work, the ALJ is generally required to utilize testimony of a vocational expert if the claimant suffers from non-exertional impairments that limit her ability to perform the full range of work described in one of the specific categories set forth in the guidelines. *Jones*, 619 F.3d at 971–72. In order for a vocational expert's testimony to constitute substantial evidence, the ALJ must pose a hypothetical question that comprises all of the claimant's impairments. *See Taylor v. Chater*, 118 F.3d 1274, 1278 (8th Cir. 1997) (stating that a vocational expert's testimony may be considered substantial

evidence "only when the testimony is based on a correctly phrased hypothetical question that captures the concrete consequences of a claimant's deficiencies").  "When a hypothetical question does not encompass all relevant impairments, the vocational expert's testimony does not constitute substantial evidence."  *KKC ex rel. Stoner v. Colvin*, 818 F.3d 364, 377 (8th Cir. 2016) (quoting *Hunt v. Massanari*, 250 F.3d 622, 626 (8th Cir. 2001)).

In this case, a vocational expert, Deborah Determan, testified at the ALJ hearing. First, the ALJ asked the expert whether a hypothetical individual of Hernandez's age, education, work experience, with limitations including sedentary work, minimal coworker supervision and public interactions, and who was limited to no more than simple instructions and tasks could find work.  Filing No. 10-3, at 105-06.  The expert stated that the hypothetical worker could find work as a document preparer, an addresser, or a cutter and paster.  *Id.* at 106.  Next, the ALJ asked whether these jobs would be available if the hypothetical worker was unable to perform math.  *Id.*  The expert stated that the three jobs require the lowest level of math, which is grades one through three.  *Id.*  The ALJ then asked whether these jobs would be available if the hypothetical worker could not stoop or bend, just as Hernandez could not bend or stoop.  *Id.* at 107.  The expert stated that under Social Security regulations a person who is unable to stoop is precluded from sedentary work.  *Id.*  Finally, the ALJ asked whether a person under the first hypothetical who would be off-task up to 20% of the workday, and absent from work on an unscheduled basis four or more times per month would be able to find work.  *Id.* at 107-08.  The expert stated that either restriction alone would preclude competitive employment.  *Id.* at 108.

The ALJ concluded that Hernandez could work despite a vocational expert specifically stating that Hernandez's concentration difficulties and work absences would preclude competitive employment. The hearing testimony reflects that the ALJ asked the vocational expert whether an individual with Hernandez's age, education, work experience, and limitations, who would be off task for up to 20% of the workday, and absent from work on an unscheduled basis four or more times per month, would be able to find work. Filing No. 10-3, at 107-8. The vocational expert responded that either restriction *alone* would preclude competitive employment. *Id.* According to Dr. Doyle, Hernandez meets both these restrictions. Filing No. 10-10, at 484. Dr. Doyle affirmed that Hernandez would be off task, or unable to work at a competitive pace for more than 20% of an 8-hour work day due to concentration difficulties. *Id.* Additionally, Dr. Doyle marked that Hernandez's impairments would cause her to be absent from work more than four days per month. *Id.* Carrying over this error, the RFC crafted by the ALJ fails to include workday absences or unscheduled breaks.

The ALJ improperly discounted the opinions of Dr. Doyle and Dr. Fix and ignored the vocational expert's statement that an individual with Hernandez's background and limitations would be unable to find competitive work. Specifically, the vocational expert stated that an individual with Hernandez's limitations who would be off task 20% of the day and would be absent more than four days a month would be unable to find competitive work. Considering this evidence, the record supports finding that Hernandez's impairments would preclude employment.

A reversal and remand for an immediate award of benefits is appropriate where the record overwhelmingly supports a finding of disability. *Taylor,* 118 F.3d at 1279. The

court finds that "the clear weight of the evidence fully supports a determination [Titsworth] is disabled within the meaning of the Social Security Act." *See Pate-Fires v. Astrue*, 564 F.3d 935, 947 (8th Cir. 2009). The Eighth Circuit has repeatedly approved of immediately awarding benefits based on the controlling weight afforded to the opinion of a claimant's treating medical provider. *See id.*; *Shontos v. Barnhart*, 328 F.3d 418, 427 (8th Cir. 2003); *Cunningham v. Apfel*, 222 F.3d 496, 503 (8th Cir. 2000); *Singh v. Apfel*, 222 F.3d 448, 453 (8th Cir. 2000); *but see Papesh*, 786 F.3d at 1135-36. Where further hearings would merely delay receipt of benefits, an order granting benefits is appropriate. *Hutsell v. Massanari,* 259 F.3d 707, 714 (8th Cir. 2001).

In light of the evidence in the record, the Court finds that Hernandez is clearly disabled and entitled to an award of benefits. Accordingly,

IT IS ORDERED:

1.      The plaintiff's motion to reverse (Filing No. 14) is granted;

2.      The defendant's motion to affirm (Filing No. 17) is denied;

3.      The decision of the Commissioner is reversed;

4.      This action is remanded to the Social Security Administration for an award of benefits.

Dated this 14th day of March, 2019.

                                                          BY THE COURT:

                                                          s/ Joseph F. Bataillon
                                                          Senior United States District Judge